# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

APRIL TILLMAN,

        Defendant.

No. 12-CR-2024-CJW-MAR

**MEMORANDUM
OPINION AND ORDER**

## *I.     INTRODUCTION*

This matter is before the Court on defendant's Motion for Compassionate Release filed on June 11, 2020.  (Docs. 822 & 823).  On June 15, 2020, the government timely filed a brief in resistance.  (Doc. 824).  On June 22, 2020, defendant timely filed a reply.  (Doc. 829).  Oral argument was not requested and is not necessary.  *See* LR 7(c).  For the following reasons, the Court **grants** defendant's motion.

## *II.     RELEVANT BACKGROUND*

From 2010 to 2012, Defendant was a known user of heroin in Waterloo, Iowa.  (Doc. 523, at 5, 8).  To support her addiction, she assisted individuals involved in heroin distribution.  (*Id.*, at 9).  In late 2010, defendant on two occasions provided transportation to a heroin dealer, C.J., to assist in picking up heroin for distribution.  (*Id.*).  On one of those occasions, defendant pooled her own money with C.J.'s money to assist in buying a larger quantity of heroin.  (*Id.*).  Defendant also watched C.J.'s home while C.J. travelled to acquire heroin, helped C.J. cut, mix, and package heroin, directed heroin trafficking at C.J.'s residence, and sold her own heroin to C.J.'s customers when C.J. had none to sell.  (*Id.*).  Defendant provided similar but less significant services to two

other heroin dealers, V.K. and "Jello." (*Id.*, at 10). In early 2012, defendant developed her own source of heroin and began selling heroin in Waterloo. (*Id.*). Defendant also sold prescription pain medication when heroin was not available. (*Id.*, at 11).

On August 22, 2012, a grand jury issued an Indictment charging defendant with one count of conspiracy to distribute heroin in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 846, and 851 ("Count 1").[1] (Doc. 15). On September 23, 2012, officers arrested defendant. (Doc. 100). On September 24, 2012, defendant pleaded not guilty and was detained pending a hearing. (Doc. 103). On September 26, 2012, the Court held a detention hearing and released defendant pending trial. (Doc. 110). In October 2012, defendant tested positive for marijuana twice and failed to call her supervising officer once, but revocation was not recommended due to her participation in drug treatment. (Doc. 523, at 4). In March 2013, defendant failed to provide a urine specimen for drug testing twice. (*Id.*). On July 22, 2013, defendant's jury trial began. (Doc. 463). On July 24, 2013, the jury found defendant guilty of Count 1 of the Indictment and defendant was detained pending sentencing. (Doc. 466).

On September 24, 2013, the United States Probation Office ("USPO") filed defendant's final presentence investigation report ("PSR"). (Doc. 523). Defendant was, at that time, 47 years old and residing in Chicago, Illinois, where she was also born. (*Id.*, at 3). Defendant reported her father had histories of heroin and cocaine abuse and criminal activity and her mother had histories of heroin abuse and prostitution. (*Id.*, at 18). Following her removal from her parents' care and placement with her grandmother at age 10, defendant described her childhood as "great." (*Id.*). Defendant reported all her siblings abused heroin and cocaine in the past. (*Id.*, at 19). She had earned her GED and taken some college courses online. (*Id.*, at 25). She had been unemployed for at

---

[1] Defendant had 13 co-defendants facing a variety of criminal charges. (Doc. 15).

least the past 17 years. (*Id.*, at 26). Defendant had four children across three relationships, two of whom were incarcerated on drug-related offenses and one of whom passed away as a juvenile while incarcerated. (*Id.*). Defendant noted her mother adopted two of her children due to defendant's drug use. (*Id.*).

Defendant's health history was complex. In 1997, she attempted suicide by slitting her wrists. (*Id.*, at 23). In 1999, she attempted suicide by jumping out of a window. (*Id.*). In August 2007, she attempted suicide by running into traffic. (*Id.*, at 22). In October 2007, defendant attempted suicide by jumping out of a second-story window while on cocaine and heroin, fracturing her hip. (*Id.*, at 20). Defendant was admitted to the psychiatric unit for depression and suicidal ideation. (*Id.*, at 23). In 2008, she was diagnosed with depression and bipolar disorder.[2] (*Id.*, at 23). In November 2010, she sustained multiple fractures when she "fell" out of a second-story window onto a sidewalk while under the influence of drugs and had to be airlifted to a hospital. (*Id.*, at 20–21). She underwent multiple surgeries and was diagnosed with polysubstance dependence (marijuana abuse, cocaine abuse, and opioid dependence) and major depressive disorder before being discharged in January 2011. (*Id.*, at 21). At that time, doctors determined she had a history of auditory hallucinations which prompted some of her earlier suicide attempts. (*Id.*, at 23). Defendant was regularly readmitted for chronic pain resulting from her multiple fractures throughout 2011. (*Id.*, at 21–22). Defendant had histories of chronic pain, peripheral neuropathy, osteoarthritis, cardiac dysthymia, hypertension, allergic rhinitis, alcohol abuse and dependence, mood disorder, and anxiety. (*Id.*, at 22–23). Defendant reported long histories of alcohol, marijuana, cocaine, and heroin abuse, using the latter three daily at some points. (*Id.*, at 24). She

---

[2] It appears she may have attempted suicide in 2008 by again stepping into traffic, although this may refer to her prior 2007 suicide attempt. (Doc. 523, at 23).

participated in drug treatment at least twice, and successfully completed one program. (*Id.*, at 24–25).

Defendant's criminal history was significant. In 1985, she was convicted of disorderly conduct for soliciting sex from passing motorists. (*Id.*, at 13). In 1997, defendant was convicted of delivery of a controlled substance after she sold heroin to an undercover officer. (*Id.*). In 1998, she was convicted of attempted possession of a controlled substance after asking an undercover officer for "blows." (*Id.*, at 14). In 1998 and 1999, she was convicted of prostitution. (*Id.*). In November 2003, defendant was twice convicted of possession of a controlled substance for selling cocaine.[3] (*Id.*, at 15). In 2007, defendant was again convicted of selling cocaine. (*Id.*). Defendant's probation was revoked or terminated unsatisfactorily nearly every time she was placed on probation. (*Id.*, at 13–16). Prior to the instant offense, the longest period of incarceration she had served was 11 months. (*Id.*).

On September 30, 2013, the Court held a sentencing hearing but ultimately continued the proceeding to resolve a dispute over drug quantity. (Docs. 536; 604, at 16). On October 30, 2013, the Court sentenced defendant. (Doc. 566). Defendant was in criminal history category IV with a total offense level of 16, yielding an advisory guideline range of imprisonment of 33 to 41 months. (Doc. 523, at 28). Defendant's offense, however, was subject to a mandatory minimum term of incarceration of 120 months. (Doc. 604, at 4). The Court was required to impose at least five years on supervised release and empowered to impose up to life on supervised release. (*Id.*).[4] The Court sentenced defendant to 120 months' imprisonment followed by five years on

---

[3] On the first occasion, officers witnessed defendant and two others shouting "rocks, rocks" at passing pedestrians and motorists. (Doc. 523, at 15).

[4] The PSR sentencing information predates the government's withdrawal of its request for a sentencing enhancement under Section 851. (Doc. 604, at 4).

4

supervised release. (Doc. 567). On November 7, 2013, defendant timely appealed. (Doc. 574). On August 27, 2014, the Eight Circuit Court of Appeals affirmed defendant's conviction and sentence. (Doc. 677). On January 7, 2015, defendant filed a pro se motion to reduce her sentence in light of an amendment to the United States Sentencing Guidelines ("USSG"). (Doc. 687). On June 12, 2015, the Court denied defendant's motion. (Doc. 706). Defendant is currently incarcerated at FCI Pekin with a projected release date of February 21, 2022. (Doc. 823, at 2).

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

5

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the USSG discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

## IV.   DISCUSSION

### A.   *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states the court may reduce a defendant's term of imprisonment after the defendant exhausts all administrative remedies within the BOP or

6

after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  This Court has held defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement by waiting 30 days from the date the warden receives their request before filing a motion in the courts.  *See Burnside*, 2020 WL 3443944, at *4–7.

On April 8, 2020, defendant submitted her request for release to FCI Pekin's warden.  (Doc. 823–1).  On May 5, 2020, the warden denied her request.  (Doc. 823–2).  On May 22, 2020, defendant filed a pro se motion for compassionate release in this Court.  (Doc. 813).  After the Court appointed defendant counsel (Doc. 814), defendant filed her motion now before the Court on June 11, 2020 (Doc. 822).  Because 30 days elapsed since defendant submitted her request to the warden, the Court finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).

### B.      *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because her medical conditions put her at a high risk of severe complications and death if exposed to COVID-19.  (Doc. 823, at 6–13).  Defendant primarily cites her diagnoses of hypertension,[5] heart disease, asthma, chronic obstructive pulmonary disease ("COPD"),[6] and diabetes, and secondarily mentions her obesity.  (*Id.*).  Although the

---

[5] Hypertension refers to high blood pressure.  Blood pressure of less than 120/80 mm Hg is considered within normal range.  *Understanding Blood Pressure Readings*, American Heart Association, https://www.-heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings.  Elevated blood pressure is when readings consistently show 120–129 systolic and less than 80 mm Hg diastolic.  *Id.*  Hypertension Stage 1 is when readings consistently show 130–139 systolic or 80–89 mm Hg diastolic.  *Id.*  Hypertension Stage 2 is when readings consistently show 140/99 mm Hg or higher.  *Id.*  Hypertensive crisis, which requires immediate medical attention, is when readings suddenly exceed 180/120 mm Hg.  *Id.*

[6] COPD "refers to a group of diseases that cause airflow blockage and breathing-related problems."  *What is COPD?*, CDC, https://www.cdc.gov/copd/index.html.

government acknowledges defendant's medical conditions are supported by the record and place her at a higher risk of severe illness if exposed to COVID-19, the government nonetheless argues her conditions do not warrant release. (Doc. 824, at 12). The government emphasizes that there are currently no known cases of COVID-19 at FCI Pekin. (*Id.*, at 13); *see also COVID-19*, BOP, https://www.bop.gov/coronavirus/.

Numerous courts have held a defendant's relevant health conditions and the presence of COVID-19 within the BOP generally, or within the defendant's specific facility, together can constitute an extraordinary and compelling reason for compassionate release. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases). The Centers for Disease Control ("CDC") lists nine categories of people who are at higher risk of severe illness and death from COVID-19: (1) people 65 years or older, (2) people living in a long-term care facility, (3) people with chronic lung disease or moderate to severe asthma, (4) people with a serious heart condition, (5) people with a compromised immune system, (6) severely obese people with a body mass index ("BMI") of 40 or above, (7) diabetic people, (8) people with chronic kidney disease undergoing dialysis, and (9) people with liver disease. *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The latter seven categories apply to "[p]eople of all ages with underlying conditions, particularly if not well controlled[.]" *Id.*

Defendant, now 54 years old, falls into three of the CDC's risk categories as a person with a chronic lung disease and at least moderate asthma, various serious heart conditions, and diabetes. There is little dispute here that defendant has multiple serious vulnerabilities to COVID-19. Defendant's hypertension has been described as "uncontrolled" since as early as May 2019 and as recently as January 2020. (Docs. 823–3, at 41; 823–4, at 35). She is consistently in stages of hypertension with recent blood pressure readings as follows: 158/72 on May 29, 2019; 157/96 on June 10, 2019; 151/83

8

on June 13, 2019; 157/78 and 143/71 on June 16, 2019; 150/85 on July 1, 2019; 152/87 on August 2, 2019; 133/76 on August 21, 2019; 147/83 on October 18, 2019; 123/73 on November 22, 2019; 167/86 on December 30, 2019; 149/86 on January 22, 2020; 149/74 on January 23, 2020; 117/71 on January 27, 2020; and 144/80 on May 11, 2020. (Docs. 823–3, at 71–72; 823–4, at 38). Defendant receives the highest allowable daily dosage of carvedilol for her hypertension. (Doc. 823–4, at 66). Her asthma and emphysema are also substantial, requiring regular use of a high-strength inhaler. (Docs. 823–3, at 29, 35, 38–39, 121; 823–4, at 64) (showing defendant's growing need for stronger grades of inhalers over time). Defendant uses a rescue inhaler approximately twice per month. (*Id.*, at 20). Her air flow rate is also consistently low or below normal range, both with and without a bronchodilator, as shown by her following measurements: 280, 300, and 310 unassisted and 330, 340, and 350 with the bronchodilator on June 16, 2019; 310, 360, and 370 unassisted on July 1, 2019; 390, 390, and 410 unassisted on August 21, 2019; and 350 twice unassisted on January 23, 2020. (Docs. 823–3, at 72; 823–4, at 38).[7]

Defendant's other conditions, as she admits, are less serious. She has congestive heart failure, but it was last noted as in remission in January 2020. (Doc. 823–4, at 36). Since June 2019, there has been some concern defendant may have an enlarged heart with pulmonary vascular congestion. (Doc. 823–3, at 150, 153). Defendant continues

---

[7] Given defendant's height of 68 inches and age of 54, her peak air flow should be around 420. (Docs. 523, at 3; 823–4, at 23) (noting defendant's height and date of birth); *Peak Flow Meter*, American Academy of Allergy, Asthma, & Immunology, https://www.aaaai.org/conditions-and-treatments/library/asthma-library/peak-flow-meter (noting normal flow rate varies based on height, age, and gender) (hereinafter *Peak Flow Meter*, AAAAI); *What is Normal Peak Flow?*, My Lungs My Life, https://mylungsmylife.org/topics/group-1/peak-flow/what-is-a-normal-peak-flow-2/ (containing a chart published by the University of Edinburgh which considers height, age, and gender). Thus, defendant's breathing rate is relatively normal when between 420 and 336, concerning when between 336 and 210, and cause for emergency when below 210. *Peak Flow Meter*, AAAAI (describing the "Traffic Light System" used in the field).

to take nitroglycerin for this condition as needed.  (Doc. 823–4, at 20); *see also Take Nitroglycerin to Ease and Avoid a Common Heart Disease Symptom*, Harvard Medical School,-https://www.health.harvard.edu/heart-health/take-nitroglycerin-to-ease-and-avoid-a-common-heart-disease-symptom (May 3, 2019) ("Nitroglycerin and related drugs, known as nitrates, widen the arteries that nourish the heart and reduces the heart's workload.").  Her diabetes is, for the most part, well-controlled with metformin.  (Doc. 823–3, at 68, 78, 131, 142).  Although she has COPD, it is not discussed with emphasis in her records.  (Doc. 823–3, at 20; 823–4, at 17–18).  She also notes she is obese with a BMI of 34, which she concedes does not meet the 40 BMI risk category.  *See* (Doc. 823–4, at 22).  These well-controlled conditions, however, compound her facially serious conditions of hypertension and asthma.  Given her substantial cardiac and respiratory issues as well as her diabetes diagnosis, defendant is at a significantly elevated risk should she be exposed to COVID-19 while incarcerated.

Currently, there are no known cases of COVID-19 at FCI Pekin.  The low risk defendant faces in her own facility at this time weighs against release.  Despite the BOP's commendable efforts to prevent transmission among its inmates,[8] there is only so much that can be done to stymie the virus.  Indeed, COVID-19 has spread among correctional facilities despite strict and prudent precautionary measures.  Thus, the virus's transmission is simply a reality and not a condemnation of the BOP's efforts.  In recognition of that reality, many courts have granted release to defendants with substantial health concerns based on the spread of COVID-19 throughout BOP facilities generally

---

[8] The BOP's measures include limiting inmate movement, suspending visits, suspending staff training and travel, screening staff and inmates for COVID-19 symptoms, and modifying operations to maximum social distancing to the extent possible.  *BOP Implementing Modified Operations*, BOP, https://www.bop.gov-/coronavirus-/covid19_status.jsp.

even when the virus is not present in the defendants' particular facility. *See, United States v. Oltmanns*, No. 09-CR-1016-CJW-MAR, 2020 WL 3453843, at \*6 (N.D. Iowa June 24, 2020) (compiling cases).[9] These rulings recognize that once the virus enters a given facility, it spreads quickly. *See United States v. Wilson*, No. 14-209-1, 2020 WL 1975082, at \*2 (E.D. Penn. Apr. 24, 2020) ("Correctional and detention facilities present unique challenges for control of COVID-19 transmissions among incarcerated/detained persons . . . [because they] are at special risk of infection, given their living situations, and may also be less able to participate in proactive measures to keep themselves safe[.]") (internal quotation marks, citations, and original alterations omitted); *United States v. Park*, No. 16-cr-473 (RA), 2020 WL 1970603, at \*2 (S.D.N.Y. Apr. 24, 2020) ("The nature of prisons—crowded, with shared sleeping spaces and common areas, and often with limited access to medical assistance and hygienic products—put those incarcerated inside a facility with an outbreak at heightened risk.").

Although the current absence of COVID-19 at defendant's facility significantly diminishes her immediate risk, the Court cannot ignore the likelihood of the virus's spread and the severe consequences defendant could face due to her multiple vulnerabilities. The Court acknowledges COVID-19 is present in every county in Iowa, but the conditions of incarceration inherently limit social distancing measures and create a greater risk of exposure. The Court has carefully considered the severity of the risk this defendant faces against the likelihood of her exposure to COVID-19. Given her medical conditions, she would be in far greater jeopardy than the average inmate in the probable event of a COVID-19 flare-up at FCI Pekin. Defendant's health conditions are

---

[9] In *United States v. Oltmanns*, this Court found the defendant's severe obesity, atrial fibrillation, hypertension, hyperlipidemia, anemia, vitamin D deficiency, and probable COPD constituted an extraordinary and compelling reason for release despite the absence of COVID-19 at FCI Pekin. 2020 WL 3453843, at \*3, \*6. The Court ultimately found, however, that release was not appropriate under the Section 3553(a) factors. *Id.*, at \*7.

so significant and susceptible to COVID-19 that even her currently low risk of exposure is too great a risk to tolerate given the potential consequences. Thus, the Court finds the combination of defendant's medical conditions and the status of COVID-19 in the BOP generally presents an extraordinary and compelling reason that warrants early release.

### C.     Section 3553(a) Factors and Danger to Community

Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

Defendant's underlying offense shows she was a long-time heroin addict and peripheral figure in the heroin trade in Waterloo from 2010 to 2012. She participated in the distribution of heroin to support her addiction. In 2012, her conduct escalated, and she became a small-time dealer of heroin and occasionally prescription pain medication. She has five prior drug-related convictions, all for relatively small amounts of drugs, and three prostitution convictions. Her performance on probation has been consistently poor and she has almost no employment history. Mitigating though is her upbringing. Both of her parents were addicted to controlled substances and her mother also had a history of prostitution. Defendant and all her siblings grappled with substance abuse throughout

12

their lives.  Although defendant was 47 at the time of the instant offense, she suffered from severe mental health issues for decades which were undoubtedly related to her polysubstance abuse.  Her criminal history reflects this erratic and addiction-drive behavior.  She also showed some drive for self-betterment by earning her GED and enrolling in community college classes.

While incarcerated, defendant has furthered her education by taking a significant number of courses.  (Doc. 823–7).  She has also held a job.  (*Id.*).  Defendant has only two disciplinary reports from prison, one assault without serious injury in 2016 and one possession of an unauthorized item in 2018.  (Doc. 823–6).  She has a suitable release plan with her brother, who works as a research coordinator for a hospital and an apartment manager, and his wife, who work as a manager at a food processing plant.  (Doc. 823–8).  Although her brother has a 1994 felony drug conviction, he was released from prison in 2000 and has been sober ever since.  (*Id.*).  It does not appear any children are in the home and no firearms are present.  (*Id.*).  Indeed, it appears defendant would have a support system that is well-equipped to help her if released.  Further, she would remain on supervised release for the next five years, during which the USPO will be able to offer her further drug treatment, employment opportunities, and the disciplinary structure necessary to deter her from returning to using or dealing in narcotics.

The question then is whether defendant's incarceration of nearly eight years has served the goals of Section 3553(a) thus making the final year and a half of her imprisonment unnecessary in light of her health conditions.  The Court has concerns about defendant's performance.  Even considering the mitigating circumstances here, she has a recidivist history of low-level drug distribution and addiction.  She has not performed well on release in the past although she fared somewhat better under supervision by this Court.  Notably, this is defendant's first significant term of incarceration.  Prior to the instant offense, she was incarcerated for only a few weeks or

months at a time, just under a year at the most in one instance. Moreover, defendant is eligible for home detention on August 21, 2021. (Doc. 823–5, at 3). Defendant requests she be placed on home confinement for what would have been the remainder of her term of imprisonment. (Doc. 829, at 4). She has already served approximately 80 percent of her original term of incarceration. It is also noteworthy that, but for the statutory mandatory minimum sentence, defendant would have completed her Guidelines sentence by now.

Defendant's nearly eight years of incarceration has justly punished her underlying conduct and promoted respect for the law, particularly in light of her upbringing, addiction, and mental health issues. Home confinement would continue to deter this defendant and curb any residual danger she presents to the community. Given defendant's multiple health risks in light of the pandemic, the mitigating circumstances present, and the promising structure of her release plan, the Court finds home confinement appropriate. Allowing defendant to serve the remainder of her term of incarceration on home confinement will better protect her from the significant health risks she faces during the pandemic and afford her the opportunity to transition back into society under controlled and monitored circumstances. *See, e.g.*, *United States v. Arroyo*, No. EP-6-CR-479-PRM-1, 2020 U.S. Dist. LEXIS 109961 (W.D. Tex. June 16, 2020) (granting release on home confinement to a defendant incarcerated in 2006 on drug-related offenses, despite his extensive criminal history, due to his compromised immune system, service of 85 percent of his sentence, and improvement while incarcerated); *United States v. White*, No. 13-cr-20653-1, 2020 U.S. Dist. LEXIS 88542 (E.D. Mich. May 20, 2020) (granting release on home confinement to a defendant incarcerated in 2014 on firearm and cocaine distribution offenses, despite his significant criminal history, due to his hypertension and obesity, service of 80 percent of his sentence, and improvement while incarcerated).

## V.    CONCLUSION

For these reasons, defendant's Motion for Compassionate Release (Doc. 822) is **granted**.  Defendant's sentence is **reduced** to **time served as of July 28, 2020**.  Upon release, defendant shall be placed on **home confinement** for **up to 18 months** as part of her supervised release.  Defendant shall be responsible for the **costs** of such home confinement.  All other conditions of defendant's Judgment shall remain the same.  (Doc. 567).  The Clerk of Court is **directed** to provide a copy of this Order to the USPO and FCI Pekin.[10]

**IT IS SO ORDERED** this 30th day of June, 2020.

_____

C.J. Williams
United States District Judge
Northern District of Iowa

---

[10] To the extent defendant's pro se motion for compassionate release (Doc. 813) is not superseded by her current motion (Doc. 822), the Court **denies** it as moot.